UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUIS ORTIZ | : | |
| | : | |
| VS. | : | CIVIL NO. |
| | : | |
| STATE OF CONNECTICUT, | : | |
| DEPT. OF TRANSPORTATION | : | JULY 6, 2020 |

## C O M P L A I N T

COUNT ONE

1.  This is an action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, to redress the deprivation by the defendant of rights secured to the plaintiff by the laws of the United States.  The defendant followed a continuous pattern and practice of retaliating against the plaintiff because of his opposition to unlawful employment practices and a hostile working environment for Hispanic and other minority workers within the Connecticut Department of Transportation.

2.  Jurisdiction of this court is invoked under the provisions of Sections 1331, 1343(3), 1367(a) and 2201(a) of Title 28 and Sections 1981 and 2000e of Title 42 of the United States Code.

3.  During all times mentioned in this action, the plaintiff was, and still is,

1

an adult citizen of the United States residing in the State of Connecticut.  He is of Hispanic ancestry and ethnicity..

4.  During all times mentioned in this action, the defendant was and is an employer within the meaning of the aforesaid statutes and at all relevant times employed more than one hundred individuals.

5.  The plaintiff has complied with all of the procedural prerequisites to suit under the statutes aforementioned, having filed a timely complaint with the United States Equal Employment Opportunity Commission and having received a Notice of Right to Sue issued on June 22, 2020..

6.  The plaintiff has been employed as a Maintainer II by the defendant since on or about July 2012.

7.  On more than one occasion prior to January 1, 2019, the plaintiff filed complaints of employment discrimination and a hostile working environment, because of his Hispanic heritage, with the Equal Employment Opportunity office of the defendant.  Not only was he not provided with any relief, but he was instructed that he could not file a complaint with the Connecticut Commission on Human Rights and Opportunities or the United States Equal Employment Opportunity Commission as long as his complaint was pending with the DOT EEO office.  As a result, his time-limited window of opportunity to file such complaints was repeatedly cut off.

2

8.  On March 27, 2019, the plaintiff filed a lawsuit in this Court alleging that the defendant and two of its supervisory officials, Donald Remson and Pasqualino Bruno, had subjected him to a longstanding pattern of discrimination and harassment based upon his ethnicity.  That action was served upon the defendant and assigned Docket Number 3:19cv462(JCH).  It remained active on the docket of the Court until October 23, 2019.

9.  The said lawsuit alleged that for at least the six months prior to the date of filing,  the defendant, acting through its said supervisory officials, had caused and/or permitted a hostile work environment based upon race and ethnicity to exist for employees of the defendant's Milford Garage, including the plaintiff.

10.  The said lawsuit alleged that on or about October 2018 Crew Leader Joseph Kelly was in the breakroom talking about the new white-colored trucks that had been given to DOT employees.  Previously the trucks had been colored orange.  Employees had orange colored bracelets that said "respect the orange" meaning that people were to respect the fact of them being employed by DOT for safety reasons.  When the truck color was changed, Kelly stated to multiple employees in the breakroom: "Now I'm going to get a white bracelet that says, "Respect the White."  He looked around at employees and said:  "What do you people have to say about that?"  He repeated it several times.  The plaintiff

3

reported this to Remson but no action was taken.

11.  The said lawsuit alleged that on or about October 2018 an employee named Joseph Kelly had stated to an African-American employee in the presence of another African-American employee and an Hispanic employee that black people have a lot of children because they can't afford televisions so they entertain themselves in other ways.

12.  The said lawsuit alleged that on or about February 3, 2019, a Caucasian employee named Russell Reid was playing very loudly on his cellphone a speech asserting that minorities and illegal aliens are not normal human people and therefore a wall is needed to keep them out of America. While he played this speech, he shook his cellphone at the plaintiff and other minority employees.  The lawsuit further alleged that on at least thirty occasions during the prior six months two Caucasian employees had used the phrases "worthless niggers," "good for nothing niggers," "lazy niggers," "piece of shit niggers," "loud mouth spics," "ghetto Puerto Ricans," "dirty Mexicans," and  "good for nothing spics" directly to the black and Puerto Rican employees at the Milford garage.  Repeated complaints about this conduct were made to Remson and Bruno but nothing was done.

13.  The said lawsuit alleged that on one occasion Bruno made an

4

African-American employee named Dean O'Bannner clean Bruno's shoes in the presence of other workers.

14.  The said lawsuit alleged that management at the Respondent's Milford garage regularly refused to provide the same training opportunities to Hispanic and African-American employees that it has provided to Caucasians.

15.  The said lawsuit alleged that on or about August 2018 the plaintiff was brought into a meeting with two Caucasian males and was promised training to fill a graded position as a Road Inspector.  Instead of providing such training to the plaintiff, however, the position was within a single pay period given to a Caucasian employee who had no seniority and who was still on new hire probation.

16.  The said lawsuit alleged that on or about May 18, 2018, the plaintiff had been promised that he would be given training on a "side flail" to make up for the missed inspector training.  However, he never was provided such training.

17.  The said lawsuit alleged that the plaintiff again asked for training on the "side flail" and was expressly refused such training on the ground that the machine was assigned to a Caucasian male with less seniority than the plaintiff. That Caucasian male, whose name is Russell Reid, is openly racist toward minority employees but is given special waivers of the requirements for heavy

lifting that ordinarily go with his position.

18.  The said lawsuit alleged that when the plaintiff complained about the foregoing discrimination he was called a "loudmouth" and a "troublemaker" and targeted for retaliation.

19.  The said lawsuit alleged that the plaintiff had repeatedly requested that he be given crew leader training, which involves serving as such in an "acting" capacity and receiving increased pay as a result, but was denied such opportunities although they were provided to Caucasians not better qualified than the plaintiff.

20.  The said lawsuit alleged that in or about August/September 2018 the plaintiff had asked for a shot at athe "flail mowers" to gain more experience and training but such opportunities were given only to two Caucasian employees (Nick Gazzi and Russell Reid) with less seniority than the plaintiff.

21.  The said lawsuit alleged that in or about September/October 2018 the plaintiff was publicly promised an inspector position.  When no training was provided to him, he complained to his union, whereupon the position was given to Gazzi, a Caucasian employee with less seniority than the plaintiff.

22.  The said lawsuit alleged that, in response to the promotion of Gazzi to the position promised to the plaintiff, the plaintiff at a group meeting asked when hard work was going to be rewarded or whether he should just stop working

6

hard.  In response, Bruno and Kelly ordered him to appear before a factfinder on

a completely false charge of refusing to work.

23.  The said lawsuit alleged that in the late summer of 2018 the plaintiff

had been summoned to a meeting at which he was threatened with a factfinding

hearing and subjected to yelling and foul language for  having gone out to his

truck to open the windows because it was a very hot day.  When the plaintiff

pointed out that no such abusive treatment was accorded to Caucasian

employees who left the building to smoke, Kelly stated: "As long as I'm here you

will never get a grade, never get any 'Q time,' or even touch a machine.  What do

you have to say about that?"

24.  The said lawsuit alleged that in November 2018 the plaintiff was

written up for being a passenger in a DOT truck when the driver, a Caucasian

senior employee named Gary Cole, parked behind the buildings to relieve

himself.  Cole was not written up.

25.  The said lawsuit alleged that the plaintiff has been made to do menial

tasks and belittled, while being told that management has the right to give an

employee whatever job management wants to do.

26.  The said lawsuit alleged that at least twice a week for the previous

two years the plaintiff and other minority employees were ordered to clean the

bathroom as a punishment.  Caucasian employees were only very rarely given

7

such assignments during that period of time.

27.  The said lawsuit further alleged that Kelly, the Caucasian supervisor who made the bathroom-cleaning assignments, frequently would shout at the plaintiff and other minority employees such things as: "Hey don't you have toilets to clean?" or "Hey clean a truck or clean a toilet."

28.  The said lawsuit alleged that in November 2018 Kelly found a way to access the plaintiff's locker, and removed a notebook in which the plaintiff kept a record of instances of ethnic harassment, abuse and discrimination.

29.  The said lawsuit alleged that, when a complaint was filed about the theft of plaintiff's notebook, Kelly responded by stating: "That's what your people are good at doing, stealing, cleaning toilets, being janitors."

30.  The said lawsuit alleged that on January 7, 2019, at a meeting of all the employees at the Milford garage, the plaintiff objected to another instance of disparate treatment and in response Bruno stated: "I'm the boss.  I run this garage....You think this is bad?  From now on I'll make you people feel right at home and run this place like a prison and make sure I screw all of you guys."

31.  The said lawsuit alleged that Black and Hispanic employees have been warned not to leave their lunches around where others can access them, because Caucasian supervisors had been spitting into it.

32.  The said lawsuit alleged that parking in the garage has been

8

segregated on a de facto basis, so that Caucasians park their vehicles on one side and minorities on the other, and that during break times minorities sit in the break room while Caucasians sit in the manager's office.

33.  The said lawsuit alleged that in March 2019 it became known that a work site where employees were required to do outdoor work was contaminated with asbestos.  Black and Hispanic employees were not given proper training or personal protective equipment to work in the area while Caucasian employees were grained, given personal protective equipment, and paid a higher wage for working in the area.

34.  The said lawsuit alleged that Black and Hispanic employees have not been allowed to take breakfast and dinner breaks during snow season, whereas Caucasian employees have been allowed to do so.

35.  The said lawsuit alleged that during April 2019 Caucasian employees were given light work week assignments while the Black and Puerto Rican employees were required to finish their work.  The lawsuit further alleged that when the plaintiff questioned this disparity in treatment, Kelly responded that the reason was that he was in charge and he could make job assignments any way that he wanted to.

36.  The said lawsuit alleged that Caucasian employees were consistently

given work assignments in left speed lane situations where there were more protective crash units available to ensure safe work areas for them, while minority employees had fewer crash units available and were instructed simply to run across the highway quickly while working on the Merritt Parkway.

37.  The said lawsuit alleged that Caucasian employee Russell Reid loudly stated on more than one occasion that minorities are illegal aliens, not humans, that they do not belong in "our" country, and that is why a wall is being built.

38.  The said lawsuit alleged that the plaintiff and others had been called "a bunch of spics" in the workplace and that African-American employees had been called "worthless niggers."

40.  The said lawsuit alleged that a crew leader named Frederick Chrisculo had stated to a group of workers that the plaintiff was not allowed to work with any other Hispanic worker because "if two Puerto Ricans work together, nothing will get done and that's why we separate you all."

41.  The said lawsuit alleged that a supervisor named Lino Bruno had twice stated to the plaintiff that "I'm going to make you all feel at home and run this place like a prison...."

42.  On August 23, 2019, Maintenance Director Stephen Moran spoke to

the plaintiff by telephone and stated that he would be disciplined if he took a day off on August 27, although the plaintiff already had been informed by another supervisor that he would be permitted to take that day off.

43. On August 28, 2019, Mr. Moran ordered the plaintiff not to take his morning break as guaranteed by contract and ordered the plaintiff to meet with him privately and without union representation, also in violation of the contract. He further informed the plaintiff that if he invoked his contractual right not to meet without union representation he would be subjected to discipline for insubordination and would be suspended without pay or terminated.

44. In contrast, a Caucasian employee who threatened to shoot a manager was given only a paid suspension and no other punishment.

45. On September 17, 2019, Wanda N. Seldon, the defendant's Acting Human Resources Administrator, suspended the plaintiff for unspecified "alleged escalating behavior that may be in violation of Personnel Memorandum 2016-1." On that same day, Mr. Moran came to the Milford Garage and informed the plaintiff that he would not receive his annual raise because of those unspecified allegations.

46. On October 10, 2019, Ms. Seldon informed the plaintiff in writing that the unspecified allegations described above were that the plaintiff had failed to comply with Mr. Moran's direct order of August 28, described above and that the

11

plaintiff had "exhibited escalating behavior when you continued to post inappropriate material on State property at the Milford Maintenance facility," namely complaints about ongoing racial and ethnic discrimination at the facility.

47.  The plaintiff was ordered to appear at a factfinding hearing on the aforesaid allegations on October 17, 2019.  At that hearing, no evidence of any kind was presented to support any claim of misconduct on the part of the plaintiff and no such findings were made.  Despite that, however, the plaintiff was kept on involuntary administrative leave for many months and as a result suffered financial loss caused by the loss of overtime and other benefits.

48.  Since that time, the plaintiff has been subjected to ongoing harassment, repeated disciplinary actions without any merit, and has been denied contractual pay increases to which he is entitled along with all other employees of the defendant.

49.  Since that time, high-level management officials of the defendant have publicly made racist statements demeaning to minorities like the plaintiff and have retained their positions with the defendant.

50.  In the manner described above, the plaintiff has been subjected to a continuous pattern of hostility in the workplace and adverse employment actions all because of his ethnicity and in retaliation for his complaints of the aforesaid systemic discrimination within the Connecticut Department of Transportation.

WHEREFORE, the plaintiff claims judgment against the defendant for compensatory damages, punitive damages, appropriate injunctive relief, and attorney fees as provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

COUNT TWO

1.  This is an action pursuant to Section 31-51q of the Connecticut General statutes to redress the deprivation by the defendant of rights secured to the plaintiff by Sections 3, 4, and 14 of Article First of the Connecticut Constitution.  The defendant followed a continuous pattern and practice of retaliating against the plaintiff because of his opposition to unlawful employment practices and a hostile working environment for Hispanic and other minority workers within the Connecticut Department of Transportation.

2.  Jurisdiction of this court is invoked under the provisions of 28 U.S.C. § 1367(a).

3.  During all times mentioned in this action, the plaintiff was, and still is, an adult citizen of the United States residing in the State of Connecticut.  He is of Hispanic ancestry and ethnicity..

4.  During all times mentioned in this action, the defendant was and is a department within the executive branch of the State of Connecticut.

13

5.  The actions of the plaintiff described herein did not substantially or materially interfere with the plaintiff's bona fide job performance or the working relationship between the plaintiff and the defendant.

6.  The plaintiff has been employed as a Maintainer II by the defendant since on or about July 2012.

7.  On more than one occasion prior to January 1, 2019, the plaintiff filed complaints of employment discrimination and a hostile working environment, because of his Hispanic heritage, with the Equal Employment Opportunity office of the defendant.  Not only was he not provided with any relief, but he was instructed that he could not file a complaint with the Connecticut Commission on Human Rights and Opportunities or the United States Equal Employment Opportunity Commission as long as his complaint was pending with the DOT EEO office.  As a result, his time-limited window of opportunity to file such complaints was repeatedly cut off.

8.  On March 27, 2019, the plaintiff filed a lawsuit in this Court alleging that the defendant and two of its supervisory officials, Donald Remson and Pasqualino Bruno, had subjected him to a longstanding pattern of discrimination and harassment based upon his ethnicity.  That action was served upon the defendant and assigned Docket Number 3:19cv462(JCH).  It remained active on the docket of the Court until October 23, 2019.

14

9.  The said lawsuit alleged that for at least the six months prior to the date of filing, the defendant, acting through its said supervisory officials, had caused and/or permitted a hostile work environment based upon race and ethnicity to exist for employees of the defendant's Milford Garage, including the plaintiff.

10.  The said lawsuit alleged that on or about October 2018 Crew Leader Joseph Kelly was in the breakroom talking about the new white-colored trucks that had been given to DOT employees.  Previously the trucks had been colored orange.  Employees had orange colored bracelets that said "respect the orange" meaning that people were to respect the fact of them being employed by DOT for safety reasons.  When the truck color was changed, Kelly stated to multiple employees in the breakroom: "Now I'm going to get a white bracelet that says, "Respect the White."  He looked around at employees and said:  "What do you people have to say about that?"  He repeated it several times.  The plaintiff reported this to Remson but no action was taken.

11.  The said lawsuit alleged that on or about October 2018 an employee named Joseph Kelly had stated to an African-American employee in the presence of another African-American employee and an Hispanic employee that black people have a lot of children because they can't afford televisions so they entertain themselves in other ways.

15

12.  The said lawsuit alleged that on or about February 3, 2019, a Caucasian employee named Russell Reid was playing very loudly on his cellphone a speech asserting that minorities and illegal aliens are not normal human people and therefore a wall is needed to keep them out of America. While he played this speech, he shook his cellphone at the plaintiff and other minority employees.  The lawsuit further alleged that on at least thirty occasions during the prior six months two Caucasian employees had used the phrases "worthless niggers," "good for nothing niggers," "lazy niggers," "piece of shit niggers," "loud mouth spics," "ghetto Puerto Ricans," "dirty Mexicans," and  "good for nothing spics" directly to the black and Puerto Rican employees at the Milford garage.  Repeated complaints about this conduct were made to Remson and Bruno but nothing was done.

13.  The said lawsuit alleged that on one occasion Bruno made an African-American employee named Dean O'Bannner clean Bruno's shoes in the presence of other workers.

14.  The said lawsuit alleged that management at the Respondent's Milford garage regularly refused to provide the same training opportunities to Hispanic and African-American employees that it has provided to Caucasians.

15.  The said lawsuit alleged that on or about August 2018 the plaintiff was brought into a meeting with two Caucasian males and was promised training

to fill a graded position as a Road Inspector.  Instead of providing such training to the plaintiff, however, the position was within a single pay period given to a Caucasian employee who had no seniority and who was still on new hire probation.

16.  The said lawsuit alleged that on or about May 18, 2018, the plaintiff had been promised that he would be given training on a "side flail" to make up for the missed inspector training.  However, he never was provided such training.

17.  The said lawsuit alleged that the plaintiff again asked for training on the "side flail" and was expressly refused such training on the ground that the machine was assigned to a Caucasian male with less seniority than the plaintiff. That Caucasian male, whose name is Russell Reid, is openly racist toward minority employees but is given special waivers of the requirements for heavy lifting that ordinarily go with his position.

18.  The said lawsuit alleged that when the plaintiff complained about the foregoing discrimination he was called a "loudmouth" and a "troublemaker" and targeted for retaliation.

19.  The said lawsuit alleged that the plaintiff had repeatedly requested that he be given crew leader training, which involves serving as such in an "acting" capacity and receiving increased pay as a result, but was denied such opportunities although they were provided to Caucasians not better qualified

than the plaintiff.

20.  The said lawsuit alleged that in or about August/September 2018 the plaintiff had asked for a shot at athe "flail mowers" to gain more experience and training but such opportunities were given only to two Caucasian employees (Nick Gazzi and Russell Reid) with less seniority than the plaintiff.

21.  The said lawsuit alleged that in or about September/October 2018 the plaintiff was publicly promised an inspector position.  When no training was provided to him, he complained to his union, whereupon the position was given to Gazzi, a Caucasian employee with less seniority than the plaintiff.

22.  The said lawsuit alleged that, in response to the promotion of Gazzi to the position promised to the plaintiff, the plaintiff at a group meeting asked when hard work was going to be rewarded or whether he should just stop working hard.  In response, Bruno and Kelly ordered him to appear before a factfinder on a completely false charge of refusing to work.

23.  The said lawsuit alleged that in the late summer of 2018 the plaintiff had been summoned to a meeting at which he was threatened with a factfinding hearing and subjected to yelling and foul language for  having gone out to his truck to open the windows because it was a very hot day.  When the plaintiff pointed out that no such abusive treatment was accorded to Caucasian employees who left the building to smoke, Kelly stated: "As long as I'm here you

will never get a grade, never get any 'Q time,' or even touch a machine.  What do you have to say about that?"

24.  The said lawsuit alleged that in November 2018 the plaintiff was written up for being a passenger in a DOT truck when the driver, a Caucasian senior employee named Gary Cole, parked behind the buildings to relieve himself.  Cole was not written up.

25.  The said lawsuit alleged that the plaintiff has been made to do menial tasks and belittled, while being told that management has the right to give an employee whatever job management wants to do.

26.  The said lawsuit alleged that at least twice a week for the previous two years the plaintiff and other minority employees were ordered to clean the bathroom as a punishment.  Caucasian employees were only very rarely given such assignments during that period of time.

27.  The said lawsuit further alleged that Kelly, the Caucasian supervisor who made the bathroom-cleaning assignments, frequently would shout at the plaintiff and other minority employees such things as: "Hey don't you have toilets to clean?" or "Hey clean a truck or clean a toilet."

28.  The said lawsuit alleged that in November 2018 Kelly found a way to access the plaintiff's locker, and removed a notebook in which the plaintiff kept a record of instances of ethnic harassment, abuse and discrimination.

29.  The said lawsuit alleged that, when a complaint was filed about the theft of plaintiff's notebook, Kelly responded by stating: "That's what your people are good at doing, stealing, cleaning toilets, being janitors."

30.  The said lawsuit alleged that on January 7, 2019, at a meeting of all the employees at the Milford garage, the plaintiff objected to another instance of disparate treatment and in response Bruno stated: "I'm the boss.  I run this garage....You think this is bad?  From now on I'll make you people feel right at home and run this place like a prison and make sure I screw all of you guys."

31.  The said lawsuit alleged that Black and Hispanic employees have been warned not to leave their lunches around where others can access them, because Caucasian supervisors had been spitting into it.

32.  The said lawsuit alleged that parking in the garage has been segregated on a de facto basis, so that Caucasians park their vehicles on one side and minorities on the other, and that during break times minorities sit in the break room while Caucasians sit in the manager's office.

33.  The said lawsuit alleged that in March 2019 it became known that a work site where employees were required to do outdoor work was contaminated with asbestos.  Black and Hispanic employees were not given proper training or personal protective equipment to work in the area while Caucasian employees were grained, given personal protective equipment, and paid a higher wage for

working in the area.

34.  The said lawsuit alleged that Black and Hispanic employees have not been allowed to take breakfast and dinner breaks during snow season, whereas Caucasian employees have been allowed to do so.

35.  The said lawsuit alleged that during April 2019 Caucasian employees were given light work week assignments while the Black and Puerto Rican employees were required to finish their work.  The lawsuit further alleged that when the plaintiff questioned this disparity in treatment, Kelly responded that the reason was that he was in charge and he could make job assignments any way that he wanted to.

36.  The said lawsuit alleged that Caucasian employees were consistently given work assignments in left speed lane situations where there were more protective crash units available to ensure safe work areas for them, while minority employees had fewer crash units available and were instructed simply to run across the highway quickly while working on the Merritt Parkway.

37.  The said lawsuit alleged that Caucasian employee Russell Reid loudly stated on more than one occasion that minorities are illegal aliens, not humans, that they do not belong in "our" country, and that is why a wall is being built.

38.  The said lawsuit alleged that the plaintiff and others had been called

21

"a bunch of spics" in the workplace and that African-American employees had been called "worthless niggers."

40.  The said lawsuit alleged that a crew leader named Frederick Chrisculo had stated to a group of workers that the plaintiff was not allowed to work with any other Hispanic worker because "if two Puerto Ricans work together, nothing will get done and that's why we separate you all."

41.  The said lawsuit alleged that a supervisor named Lino Bruno had twice stated to the plaintiff that "I'm going to make you all feel at home and run this place like a prison...."

42.  On August 23, 2019, Maintenance Director Stephen Moran spoke to the plaintiff by telephone and stated that he would be disciplined if he took a day off on August 27, although the plaintiff already had been informed by another supervisor that he would be permitted to take that day off.

43.  On August 28, 2019, Mr. Moran ordered the plaintiff not to take his morning break as guaranteed by contract and ordered the plaintiff to meet with him privately and without union representation, also in violation of the contract. He further informed the plaintiff that if he invoked his contractual right not to meet without union representation he would be subjected to discipline for insubordination and would be suspended without pay or terminated.

44.  In contrast, a Caucasian employee who threatened to shoot a

22

manager was given only a paid suspension and no other punishment.

45.  On September 17, 2019, Wanda N. Seldon, the defendant's Acting

Human Resources Administrator, suspended the plaintiff for unspecified "alleged

escalating behavior that may be in violation of Personnel Memorandum 2016-1."

On that same day, Mr. Moran came to the Milford Garage and informed the

plaintiff that he would not receive his annual raise because of those unspecified

allegations.

46.  On October 10, 2019, Ms. Seldon informed the plaintiff in writing that

the unspecified allegations described above were that the plaintiff had failed to

comply with Mr. Moran's direct order of August 28, described above and that the

plaintiff had "exhibited escalating behavior when you continued to post

inappropriate material on State property at the Milford Maintenance facility,"

namely complaints about ongoing racial and ethnic discrimination at the facility.

47.  The plaintiff was ordered to appear at a factfinding hearing on the

aforesaid allegations on October 17, 2019.  At that hearing, no evidence of any

kind was presented to support any claim of misconduct on the part of the plaintiff

and no such findings were made.  Despite that, however, the plaintiff was kept

on involuntary administrative leave for many months and as a result suffered

financial loss caused by the loss of overtime and other benefits.

48.  Since that time, the plaintiff has been subjected to ongoing

harassment, repeated disciplinary actions without any merit, and has been denied contractual pay increases to which he is entitled along with all other employees of the defendant.

49.  In the manner described above, the plaintiff has been subjected to a continuous pattern of hostility in the workplace and adverse employment actions all in retaliation for his constitutionally-protected complaints of the aforesaid systemic discrimination within the Connecticut Department of Transportation.

WHEREFORE, the plaintiff claims judgment against the defendant for compensatory damages, punitive damages, appropriate injunctive relief, and attorney fees as provided by Section 31-51q of the Connecticut General Statutes..

THE PLAINTIFF

BY:_____ /s/      (ct00215)_____
            JOHN R. WILLIAMS (ct00215)
            51 Elm Street
            New Haven, CT 06510
            203-562-9931
            Fax:  203-776-9494
            jrw@johnrwilliams.com
            His Attorney